# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DAVID MONTALVO, on behalf of Himself   )
and All Others Similarly Situated,   )
  )
    Plaintiffs,   )
  )
    vs.   )       Case No. 4:03CV995SNL
  )
TRIPOS, INC., JOHN P. MCALISTER,   )
B. JAMES RUBIN, and   )
ERNST & YOUNG, L.L.P.,   )
  )
    Defendants.   )

## MEMORANDUM

Lead Plaintiffs have filed this second amended complaint on behalf of purchasers of Tripos common stock between February 9, 2000 and July 2, 2002, inclusive. They assert violations of Section 10-b of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count I - all defendants) and Section 20(a) of the Securities Exchange Act of 1934 (Count II - individual defendants only). This matter is before the Court on defendants Tripos, McAlister, and Rubin's motion to dismiss (#56), filed August 4, 2004. Over an extended period of time, the parties have filed lengthy and extensive responsive pleadings and the matter is now ripe for disposition.

Defendants seek to dismiss this second amended complaint for failure to state a claim under Rule 12(b)(6) Fed.R.Civ.P., in connection with the "heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §78u-4, and for failure to state a claim for "control person liability" under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a). They aver, among a myriad of other things, that plaintiffs have continued to fail to 1) state with any particularity that any defendant acted with the required state

of mind (scienter); 2) state with any particularity why any challenged statement was false or

misleading when made; 3) state with any particularity all necessary facts forming the basis for the

allegations regarding a "conspiracy" to commit deliberate accounting fraud; and 4) state with any

particularity the acts committed by the individual defendants in connection with the alleged

accounting fraud.

The second amended complaint generally consists of two (2) primary claims: Firstly, that

the defendants made or participated in making false and/or misleading statements leading to a

"scheme to defraud" or course of conduct designed to operate as a fraud or deceit upon plaintiffs

as investors between February 2000 and July 2002. They contend that defendants knew of certain

events, including but not limited to, a lost software contract and improper accounting methods,

which when eventually disclosed, caused a significant drop in the stock value. Lead Plaintiffs

allege that despite knowledge of the negative events and accounting irregularities, defendants

continued throughout 2001 to forecast extremely positive revenues for defendant Tripos in order

to encourage the "investors class" to purchase the Company's securities; and that the "investors

class" relied on these false forecasts in making such purchases. Secondly, that defendant Ernst &

Young, as outside auditor and accountant for Tripos, while performing audits:

> "falsely represented that it performed these audits in accordance with
> Generally Accepted Auditing Standards (GAAS) and issued materially
> false and misleading unqualified audit opinions as to those financial
> statements during the Class Period, claiming that the financial
> statements were prepared and presented in accordance with Generally
> Accepted Accounting Principles (GAAP). Additionally, E&Y consented
> to the use of its unqualified opinion letters for Tripos' financial statements
> contained in the Company's respective Form 1-Ks for fiscal 1999, 2000,
> and 2001.. E&Y also prepared and assisted Tripos in issuing the
> Company's materially false and misleading Form 10-Qs during the
> Class Period."

Second Amended Complaint (#31), filed May 5, 2004; pg. 6, ¶18.

In passing on a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232 (1974); Conley v. Gibson, 355 U.S. 41, 45-46(1957); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir. 1986). The court must accept the allegations in the complaint as true and draw reasonable inferences in favor of the nonmoving party, dismissing the complaint only if "it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, *supra*, 355 U.S. at 45-46; *see also*, Moses.com Securities v. Comprehensive Software Systems, Inc., 406 F.3d. 1052, 1062 (8th Cir. 2005). "Although the pleading standard is liberal, the plaintiff must allege facts -- not mere legal conclusions -- that, if true, would support the existence of the claimed torts. Moses.com, at 1062 *citing* Schaller Tel.Co. v. Golden Sky Sys., 298 F.3d. 736, 740 (8th Cir. 2002). In viewing the complaint in the light most favorable to the plaintiff, the court should not dismiss it merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations. Bennett v. Berg, 685 F.2d. 1053, 1058 (8th Cir. 1982). Thus, a motion to dismiss is likely to be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982).

### Federal Securities Law - Section 10(b) and Rule 10b-5

Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities. Section 10(b) forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations". Dura Pharmaceuticals v. Broudo, - U.S. -, 125 S.Ct. 1627, 1630-31 (2005) *citing* 15 U.S.C. §78j(b); *see,* Ferris, Baker Watts, Inc. v. Ernst & Young,

L.L.P., 395 F.3d. 851, 853-54 (8th Cir. 2005); In re: K-Tel International, Inc. Securities Litigation, 300 F.3d. 881, 888 (8th Cir. 2002); In re: Navarre Corp. Securities Litigation, 299 F.3d. 735, 741 (8th Cir. 2002). Rule 10b-5 forbids, among other things, the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." Dura Pharmaceuticals, 125 S.Ct. at 1631 *citing* 17 C.F.R. §240.10b-5 (2004).

Private securities fraud actions brought under Section 10(b) and Rule 10b-5 require the pleading and showing of these elements: 1) a material misrepresentation or omission; 2) scienter (a wrongful state of mind); 3) a connection with the purchase or sale of a security; 4) reliance or "transaction causation"; 5) economic loss; and 6) "loss causation" or a causal connection between the material misrepresentation and the loss. Dura Pharmaceuticals, 125 S.Ct. at 1631; *see* Ferris, Baker Watts, at 854; K-tel, at 888; Navarre, at 741. Since Section 10(b) and Rule 10b-5 actions are grounded in fraud, the more stringent pleading standards of Rule 9(b) Fed.R.Civ.P. are applicable. In re: Nationsmart Corp. Securities Litigation, 130 F.3d. 309, 320 (8th Cir. 1997); In re: BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 987 (E.D.Mo. 1999); Jakobe v. Rawlings Sporting Goods Co., 943 F.Supp. 1143, 1152 (E.D.Mo. 1996).

Pursuant to Rule 9(b) Fed.R.Civ.P., all allegations of fraud must be stated with particularity. To meet the requirements of Rule 9(b), a pleading must include "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." Bennett v. Berg, 685 F.2d. 1053, 1062 (8th Cir. 1982); *see also*, Wiley v. Mitchell, et. al. 106 Fed.Appx. 517, 521-22 (8th Cir. 2004)(unpublished). Compliance with the particularity requirements of Rule 9 requires plaintiffs to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made,

and explain why the statements were fraudulent." In re BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 987 (E.D.Mo. 1999)(citation omitted). "[C]onclusionary allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Commercial Prop.Inv., Inc. v. Quality Inn Int'l, Inc., 61 F.3d. 639, 644 (8th Cir. 1995).

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §78u-4, embodies the pleading requirements of Rule 9 Fed.R.Civ.P. Ferris, Baker Watts, at 854; K-tel, at 889; *see* Navarre, at 742 (given that the PSLRA embodies the pleading requirements of Rule 9, plaintiffs do not need to meet the requirements of both, and the PSLRA supercedes; i.e. under Rule 9 state of mind can be averred generally; however, under the PSLRA, both falsity and scienter must be pleaded with particularity). Complaints brought under Section 10(b) and Rule10b-5 are governed by special heightened pleading standards adopted by Congress in the PSLRA. These heightened pleading standards are unique to securities actions and were adopted by Congress in an attempt to curb abuses of securities fraud litigation. Kushner v. Beverly Enterprises, 317 F.3d. 820, 826 (8th Cir. 2003) *citing* Navarre, at 741; *see* Amdocs, at 547 *citing* Navarre, at 741.

The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." Kushner, at 826; Navarre, at 741-42; 15 U.S.C. §78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Kushner, at 826; Navarre, at 741-42; 15 U.S.C. §78u-4(b)(2); *see* Ferris, Baker Watts, at 854; K-tel, at 889. The Act requires that the allegations collectively establish a strong inference of the required state of mind. Kushner, at 826. Any complaint failing to meet these pleading requirements must be dismissed. Kushner, at 826; In re: BankAmerica Corp. Securities Litigation, at 988; 15 U.S.C. §78u-4(b)(3)(A). Finally, the Reform Act requires the courts to disregard "catch-all" or "blanket" assertions that do not live up to the

particularity requirements. <u>Ferris, Baker Watts</u>, at 853;  <u>Amdocs</u>, at 547; <u>K-tel</u>, at 889; <u>Kushner</u>, at 824; <u>Florida State Bd. of Admin. v. Green Tree</u>, 270 F.3d. 645, 660 (8th Cir. 2001).

The Eighth Circuit has established a three-prong formula for assessing the adequacy of scienter allegations.  After reviewing the tests promulgated by the other circuits to meet the Reform Act's "strong inference of scienter" standard, the appellate court fashioned its own criteria for indicia of fraud:

> "Therefore, we can say three things about motive and opportunity allegations.  First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard.  Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless.  For instance, in insider trading cases, the timing of trades shows motive and opportunity, but it may also provide additional circumstantial evidence that the defendant knew of an advantage.  Such allegations may meet the Reform Act standard, but if so it is because they give rise to a strong inference of scienter, not merely because they establish motive and opportunity.  Third, when the complaint does not show motive and opportunity of any sort - either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job - then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard."

<u>Florida State Bd. of Admin. v. Green Tree</u>, at 660.

Mere negligence does not violate federal securities law; however, severe recklessness may.

<u>Ferris, Baker Watts</u>, at 854 (citations omitted).

> "Specifically, scienter may be demonstrated by severe recklessness involving `highly unreasonable omissions or misrepresentations' amounting to `an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'  Recklessness, then, may be shown where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it."

Kushner, at 828 *citing* K & S P'ship v. Cont'l Bank, N.A., 952 f.2d. 971, 978 (8th Cir. 1991); *see also*, Ferris, Watts Baker, at 854. "This level of recklessness requires that defendants make statements that they know, or have access to information suggesting, are materially inaccurate." Ferris, Baker Watts, at 854 *citing* Navarre, at 746.

The second amended complaint sets forth numerous public statements made by the defendants during the class period that the plaintiffs investors believe give rise to a strong inference of scienter because the defendants knew facts or had access to information that suggested that their public statements were not accurate and/or deliberately engaged in making false and misleading statements in order to defraud the investors as to the true financial condition of defendant Tripos. Examples of some of these allegedly inaccurate statements are as follows:

> 1) By late 2001 defendants were aware that Tripos had serious problems
>
> with its consulting line of business, including but not limited to, problems
>
> with multi-million dollar consulting contracts with Bristol Myers Squibb
>
> and Merck; and had missed a milestone in its consulting contract with
>
> Bayer AG resulting in the loss of a $1 million - $1.5 million payment;
>
> however, Tripos, beginning on January 9, 2002 began issuing a series
>
> of press releases claiming that 2002 would be a bigger financially
>
> successful year than 2001 with a projected growth rate (including
>
> the consulting services business) of at least 25%.
>
> 2) Tripos reiterated its "aggressive growth expectations" in its
>
> February 6, 2002 press release. In response to its January 2002 and
>
> February 2002 press releases, Tripos stock closed at all-time highs.
>
> 3) Again, in March 2002, Tripos released a press release reaffirming

its highly profitable sales and revenues expectations for 2002,

stating them to be in the $60-65 million dollar range, and fully

diluted earnings per share in a range from $.64 to $.70.

3) Finally, on April 24, 2002, Tripos issued a press release

announcing the results for its first quarter of 2002: a 28% increase

in revenues and a 23% increase in operating income.  It further

reiterated its firm belief in achieving its financial projections for 2002.

4) These press releases were issued proclaiming huge increases in

revenue and operating income despite the alleged knowledge by the

defendants that accounting regularities had fraudulently inflated revenues

on financial statements from 1998-2002, including but not limited to:

1999 10-K, 1999 Annual Report, the first quarter 2000 10-Q, the second

quarter 2000 10-Q, the third quarter 2000 10-Q, the 2000 10-K, the 2000

Annual Report, the first quarter 2001 10-Q, the second quarter 2001 10-Q,

the third quarter 2001 10-Q, and the 2001 10-K.

5) Although losses had been sustained in connection with the Bayer AG

and Bristol Myers Squibb consulting contracts, the defendants violated the

GAAP by failing to record same.

6) On July 1, 2002, Tripos issued a press release revising downward its

2002 financial projections due in part to the severe on-going problems

in it consulting services business, including the missed milestone with

the Bayer AG contract.

7) On July 24, 2002 Tripos issued another press release which continued

to "mischaracterize" the reasons for its financial shortfall. It blamed

the Bayer AG consulting contract event, even though problems had existed

since late 2001.

8) On February 12, 2004, Tripos announced the postponement of the

release of its 2003 fourth quarter and year-end financial results due to

its decision to "revise" its revenue recognition practice with respect to

certain software licenses. The "revision" would require Tripos to restate

its financial results for several prior years.

9) On March 31, 2004, Tripos announced that it had been improperly

accelerating revenue and improperly accounting for its costs of sales

on its time-based software arrangements since 1998 due to the "complexity

of the accounting methods"; however, the basic software recognition

policy that Tripos violated was stated in the original SOP 97-2 and in

Tripos' own filings with the SEC.

Defendants counter that plaintiffs have failed to set forth the "particularities" as to why

the statements are false or misleading. After careful review of the amended complaint, the Court

finds that the plaintiffs have provided particulars about who made subject statements, when the

statements were made, and demonstrated why the statements were allegedly false or misleading at

the time they were made. While the defendants have spent considerable time and effort explaining

how and why the statements are proper, none of these arguments undermine the plaintiffs' allegations

at the pleading stage. The facts pleaded with particularity sufficiently create a strong

inference of scienter, thus meeting the Reform Act standard. *See*, Green Tree Financial, at 667.

Defendants further have contended that the statements contained in the subject press-releases are "forward-looking" in substance and intent and thus are protected by the PSLRA's "safe harbor" provision of the PSLRA. 15 U.S.C. §78u-5(c)(1) and (2). The safe harbor provision protects forward-looking statements if they are identified and accompanied by risk disclosures, if they are immaterial, or if plaintiffs fail to prove that the person or persons making the subject statement(s) made them with actual knowledge that the statement was false or misleading. In re: Retek, Inc. Securities, et. al., 2005 WL 1430296 (D.Minn. March 7, 2005); In re: Pemstar, Inc. Sec.Lit., 2003 WL 21975563 (D.Minn. Aug. 15, 2003). The safe harbor provision "does not insulate statements that misrepresent historical/hard or current facts." In re: Pemstar, Inc. Sec. Lit., *supra*. (citations omitted).

Defendants contend that the alleged false or misleading statements are nearly all "forward-looking" in that they simply are statements of future financial projections for 2002. Plaintiffs counter (with specific examples) that the subject statements were materially false and/or misleading when made because they omit adverse information concerning the problems that the defendants were then currently experiencing; i.e., had already missed a major milestone on the Bayer AG consulting contract and widespread customer dissatisfaction with the consulting divisions Metalayer system had already been expressed. Such problems were known and not insignificant when the statements were made; therefore, it was not that the statements were necessarily false but that defendants were in possession of material facts which they had a duty to disclose so as not to make such statements misleading. Furthermore, the Court concurs that any "cautionary language" was too generalized and "boilerplate" to make such language meaningful to the ordinary investor. The Court concludes that the safe harbor provision of the PSLRA is inapplicable.

Defendants further contend that the plaintiffs' allegations of GAAP violations are not

sufficient to plead the requisite scienter for the Section 10(b) and Rule 10b-5. The plaintiffs have

alleged that the defendants were aware of the GAAP violations when made and were intentionally

made to meet analysts' profitable expectations for the company. They assert that the restatements

clearly show that the defendants failed to follow GAAP while accounting for Tripos' revenues derived

from its "bundled software services" during the Class Period. It further contends that the accounting

principles ignored are not "complex" as argued by the defendants, but rather are clear and specific

as regards the recognition of revenue from the sale of software products and licences. Furthermore,

plaintiffs argue that scienter is shown by the GAAP violations coupled with the restatements because

the defendants blamed the need for restating Tripos' financial statements on "clarifying guidance"

instead of the fact that they misapplied GAAP "that existed at the time the financial statements were

prepared". Plaintiffs' assert that

> "In sum, the GAAP principles violated here were not complex or
> changing, but were long-standing and basic accounting principles.
> The Tripos defendants were charged with the responsibility of
> providing accurate statements of the Company's revenue and the
> individual defendants were sufficiently savvy to understand these
> principles and certainly had access to and information from others
> in the Company who did understand these principles well."

Plaintiffs' Joint Memorandum of Law (#64), pg. 44. Finally, plaintiffs contend that they have pled

with sufficient particularity the GAAP violations at issue. They are:

> 1) Deferred the recording of estimated losses in excess of
> $829,000 on various contracts, including, primarily, the
> software consulting agreements with Bayer AG and Bristol
> Meyers Squibb (BMS), when GAAP required the immediate
> booking of the entire loss. Complaint ¶89. In addition,
> the Company failed to take a charge for the losses related to
> these two contracts in its interim financial statements.
> Complaint ¶¶92, 96, 98.
>
> 2) Materially inflated revenues by $15.8 million for fiscal years

1998-2002, as well as net income and earnings per share by improperly accelerating revenues on time-based software arrangements by immediately recognizing the software portion of the arrangement rather than recognizing it ratably over the entire contract period as required by GAAP. Complaint ¶¶86, 100-107.

3) Failed to identify and describe important judgments associated with its revenue recognition policy related to software licenses, in violation of specific GAAP provisions. Complaint ¶¶86, 108-109.

4) Failed to disclose serious problems with its software consulting business and the dissatisfaction of some of its major customers, including that it had missed a major milestone with a significant customer and that customer's refusal to pay, in violation of GAAP provisions. Complaint ¶¶4, 5, 50, 53, 57-65, 86-90, 98, 108-09.

5) Defendants improperly accounted for cost of sales, specifically royalty expense that was directly attributable to time-based software license arrangements in violation of GAAP. Complaint ¶¶110-13.

6) Failed to design and implement an internal control system over the Company's contract estimation process sufficient to monitor contract compliance in order to recognize cost overruns on a timely basis. The fact that Tripos had to record two separate charges to income for contract losses incurred during the Class Period indicates an inadequate accounting and internal control system. Complaint ¶¶119-20.

Plaintiffs' Memorandum in Opposition (#64), pgs. 47-48.

Essentially, the plaintiffs argue that the accounting principles and standards that existed at the time of the original positive financial statements were clear and precise. They allege that the pervasiveness and indifference to the GAAP requirements resulting in such egregious violations, coupled with the fact that the restatements admit to these violations, evidences that Tripos intentionally misstated its revenues for its software licensing contracts throughout the Class Period. Defendants spend considerable time, not addressing the pleading standards but rather defending themselves against the allegations.

"Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P., 395 F.3d. 851, 854 (8th Cir. 2005), *aff'g* 293 F.Supp.2d. 1003 (D.Minn. 2003) *quoting* In re Navarre, at 745 (citations omitted); *see also*, Kushner, at 827, 831; K-tel, at 886, 894-95. This rule was established because the GAAP "are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of `reasonable' treatments, leaving the choice among alternatives to management." K-tel, at 890 *quoting* Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979); In re Stellent, Inc. Securities Litigation, 326 F.Supp.2d. 970, 982 (D.Minn. 2004); Ferris, Baker Watts, 293 F.Supp.2d. at 1008.

Here, the plaintiffs have alleged not only egregious GAAP violations, but also "evidence of corresponding fraudulent intent". They have set out with particularity the material misstatements in the public statements which omitted, among other things, the on-going problems with the software consulting business, and have set forth the GAAP violations which defendants do not deny as evidenced by their restatements. Essentially, the amended complaint alleges that defendants knew that certain company assets were impaired and that losses were certain, but that recognizing those losses (during the Class Period) would have lowered the company's stock price and threatened its ability to market and sell its products. The amended complaint further alleges that defendants delayed recognition of these losses in violation of GAAP, and delayed disclosure of these violations while publicly touting strong future profits and continued excellent business prospects with current customers. It is alleged that the "strategic non-disclosures" kept Tripos stock artificially high, attracting more investors, until the restatements were issued, causing a drastic stock price fall. The plaintiffs have identified specific documents and statements within those documents attributable to

the defendants that allegedly artificially inflated Tripos' earnings and net tangible assets by deliberately hiding specific losses that were also identified.

The allegations as a whole, taken as true, provide strong indicia of intentional wrongdoing on the part of the defendants. Evidence relevant to scienter includes:

> "insider trading in conjunction with false or misleading statements; **a divergence between internal reports and public statements; disclosure of inconsistent information shortly after the making of a fraudulent statement or omission;** bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; **disregard of current financial information acquired prior to the statement at issue; accounting shenanigans**; and evidence of actions taken solely out of self-interest." (emphasis added)

In re Acceptance Insurance Cos. Securities Litigation, 352 F.Supp.2d. at 958 *quoting* In re Navarre Corp., at 747 (internal citation omitted). Plaintiffs have coupled there GAAP allegations with the "corresponding fraudulent intent" required under the Reform Act.

Defendants assert that the plaintiffs have failed to adequately plead loss causation because the 2004 restatements were not announced until after the end of the Class Period, and moreover, little if any significant decline in the stock price occurred following these restatements. Thus, plaintiffs have failed to allege, and cannot allege, that their losses were causally related to the accounting allegations. Plaintiffs counter that the fact that the defendants waited until 2004 to announce its restatements due to GAAP violations should not insulate them from liability for issuing false statements during the Class Period. Plaintiffs contend that as of July 1, 2002 plaintiffs learned for the first time that the Company had missed a major milestone and that continued projected high earnings and revenue of past financial reports and statements had no basis in fact. This is when and why the stock price immediately dropped 61%. Plaintiffs further contend that "[T]he February 12, 2004 restatement merely confirmed what the market had already incorporated when the stock price

dropped 61% – that the Company's financial statements were false and could not be relied upon."

Lead Plaintiffs' Joint Response (#82), pg.5. Plaintiffs further contend that their complaint is unlike

the complaint considered by the Court in the recent case of Dura Pharmaceuticals, *supra.* because

in the instant case the plaintiffs have not just generally pled that they had paid artificially inflated stock

prices and suffered damages but, instead, have specifically set forth allegations of a causal connection

between the stock price drop and the fraud committed; i.e., Tripos could not achieve its earnings

targets because those targets were based on false financial statements.

A private plaintiff who claims securities fraud must prove that the defendant's fraud caused

an economic loss. Dura Pharmaceuticals, 125 S.Ct. at 1629; 15 U.S.C. §78u-4(b)(4). In Dura

Pharmaceuticals, *supra.*, the United States Supreme Court considered what a plaintiff must allege and

ultimately prove when establishing the element of "loss causation". Firstly, the Court considered the

fact that "[n]ormally, in cases such as this one (i.e. fraud-on-the-market cases), an inflated purchase

price will not itself constitute or proximately cause the relevant economic loss. The Court reasoned:

> "For one thing, as a matter of pure logic, at the moment the
> transaction takes place, the plaintiff has suffered no loss; the
> inflated purchase payment is offset by ownership of a share
> that *at that instant* possesses equivalent value. Moreover, the
> logical link between the inflated share purchase price and any
> later economic loss is not invariably strong. Shares are normally
> purchased with an eye toward a later sale. But if, say, the
> purchaser sells the shares quickly before the relevant truth begins
> to leak out, the misrepresentation will not have led to any loss.
> If, the purchaser sells later after the truth makes its way into the
> market place, an initially inflated purchase price *might* mean a
> later loss. But that is far from inevitably so. When the purchaser
> subsequently resells such shares, even at a lower price, that lower
> price may reflect, not the earlier misrepresentation, but changed
> economic circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions, or other
> events, which taken separately or together account for some or
> all of that lower price. (The same is true in respect to a claim
> that a share's higher price is lower that it would otherwise have
> been - - a claim we do not consider here.) Other things being

equal, the longer the time between purchase and sale, the more
likely that this is so; i.e., the more likely that other factors caused
the loss."

Id., 125 S.Ct. at 1631-32. The Court went on to recognize that a higher purchase price "will

*sometimes* play a role in bringing about a future loss"; and thus, an inflated purchase price suggests

that "the misrepresentation "touches upon" a later economic loss. Id., 125 S.Ct. at 1632. However,

the law requires that such a misrepresentation **cause** a loss, not just merely **"touch upon"** a loss. Id.,

125 S.Ct. at 1632.

The Supreme Court continued to reason that the PSLRA requires specificity in securities

fraud complaints because securities statutes "seek to maintain public confidence in the marketplace"

and do by providing for private securities fraud actions; however, "the statutes make these latter

actions available, not to provide investors with broad insurance against market losses, but to protect

them against those economic losses that misrepresentation actually cause." Id., 125 S.Ct. at 1633.

Given what a private securities fraud action must prove as to "loss causation", the Supreme

Court held that simply alleging the existence of an "artificially inflated purchase price" is not itself a

relevant economic loss. That alleging nothing more than the plaintiffs paying "artificially inflated

prices" for certain securities, and that as a result plaintiffs suffered "damages" is not sufficient to

adequately plead loss causation. Id., 125 S.Ct. at 1634. A complaint that alleges only this fails to

provide a defendant with notice, as required of Rule 8 Fed.R.Civ.P., of what the relevant economic

loss might be or of what the causal connection might be between the loss and the alleged

misrepresentation. Id., 125 S.Ct. at 1634. Such lack of notice and causal connection is exactly the

kind of harm the securities statutes were designed to eliminate. Id., 125 S.Ct. at 1634.

Upon review of the plaintiffs' second consolidated amended complaint and given the Supreme

Court's recognition that "ordinary pleading rules are not meant to impose a great burden upon a

plaintiff", the Court finds that the plaintiffs have sufficiently alleged a causal connection between the purported fraud and the inflated stock price. Dura Pharmaceuticals, 125 S.Ct. at 1634 (citation omitted).

Plaintiffs also assert claims against the individual defendants McAlister (Tripos' Chief Executive Officer, President, and a director) and Rubin (Tripos' Chief Financial Officer and Senior Vice-President as of October 2001) under 20(a) of the Exchange Act. Section 20(a) of the Exchange Act imposes liability on "every person who, directly or indirectly, controls any person liable" under the Exchange Act; and such liability should be imposed "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." A "control person" relationship exists whenever "(i) the alleged control person actually exercised control over the general operations of the primary violator and ( ii) the alleged control person possessed-- but did not necessarily exercise-- the power to determine the specific acts or omissions upon which the underlying violation is predicated." Farley v. Henson, 11 F.3d. 827, 835 (8th Cir. 1993); *see*, Metge v. Baehler, 762 F.2d. 621, 624 (8th Cir. 1985); Stephenson v. Deutsche Bank AG, 282 F.Supp.2d. 1032, 1059 (D.Minn. 2003); Piper Jaffray Companies v. National Union Fire Ins. Co. of Pittsburgh, 38 F.Supp.2d. 771, 782 (D.Minn. 1999). The control-person statute is "remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a `controlling person' liable." Farley, at 836 *quoting* Myzel v. Fields, 386 F.2d. 718m 738 (8th Cir. 1967); Stephenson, at 1059 (*quoting* both Farley and Myzel, *supra.*); *see also*, Martin v. Shearson Lehman Hutton, 986 F.2d. 242, 244 (8th Cir. 1993)(statute reaches persons who have only some indirect means of discipline or influence less than actual direction). Section 20(a) can impose liability upon "corporate officers and directors, even in those cases in which they did not directly participate in the bad acts." In re Acceptance

Insurance Companies Sec. Litig., 352 F.Supp.2d. 940, 957 (D.Neb. 2004), *aff'd* - F.3d. -, 2005 WL 2060912 (8th Cir. August 29, 2005) *citing* Metge v. Beahler, at 631. Finally, Section 20(a) is not subject to the heightened pleading standards of either the Reform Act or Rule 9(b) Fed.R.Civ.P. Stephenson, at 1060 *citing* In re Initial Pub. Offering Sec.Litig., 241 F.Supp.2d. 281, 397 n.185 (S.D.N.Y. 2003).     Given the above-referenced legal principles, and in light of the Court's determination that the plaintiffs have sufficiently pled claims against these defendants for violations of Section 10(b) and Rule 10b-5, the Court will not dismiss the plaintiffs' claims against the individual defendants based on liability under Section 20(a).

The parties have spent considerable time and effort arguing the "merits" of the second amended consolidated complaint; however, the bottom line is that the plaintiffs have pleaded that during the Class Period, the defendants had in their possession (or could have easily obtained) facts which rendered their financial results materially false when first stated to the investing public, and given these facts, intentionally delayed recognition of these "facts" in violation of GAAP, then intentionally delayed recognition of the GAAP violations in order to induce plaintiffs to continue investing in a "profitable" enterprise. Without a doubt the "merits" of the allegations as presented can be argued fervently; however such a debate involves questions of fact "that cannot render the complaint[s] inadequate, lest the heightened pleading requirements of the Reform Act replace the function of a trial." Green Tree, at 666. The plaintiffs have satisfied the Reform Act standard and the defendants' motion to dismiss will be denied.

Dated this ___30th___ day of September, 2005.

SENIOR UNITED STATES DISTRICT JUDGE